# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 48810-8-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| JAMES EDWARD MITCHELL, | |
| Appellant. | |

MAXA, A.C.J. – James Mitchell appeals his conviction of first degree premeditated murder for stabbing a woman to death. Mitchell was convicted over 20 years after the crime based on DNA (deoxyribonucleic acid) testing of blood evidence collected at the crime scene.

We hold that (1) the trial court properly admitted the DNA evidence because the State showed a sufficiently complete chain of custody of the blood evidence collected at the crime scene and any discrepancies affected the weight of the evidence rather than its admissibility, (2) the State presented sufficient evidence of premeditation, and (3) the trial court did not err by including Mitchell's Florida robbery conviction in his offender score because it was comparable to robbery in Washington.

Accordingly, we affirm Mitchell's conviction of first degree premeditated murder and his sentence.

FACTS

In 2015, the State charged Mitchell with first degree murder for the stabbing death of Linda Robinson. Robinson's death had occurred over 20 years earlier, in 1993.

*Robinson's Death*

On the night of February 6, 1993, Robinson's young nieces and nephew were spending the night at Robinson's apartment. The oldest niece was seven years old, and the other two children were approximately two and one. The children were in the living room.

Around 10:30 PM that night, Robinson was talking on the telephone with her friend George Caldwell. Robinson told Caldwell to "Hold on, somebody's at the door." Report of Proceedings (RP) at 654. Then Caldwell heard Robinson talking to another person and said Robinson sounded "submissive," telling the person "okay, okay." RP at 655. But then the connection went dead.

Around 11:00 PM, the oldest child was awakened by the sound of the apartment's smoke alarm. She went to the kitchen where she saw food burning on the stove and Robinson lying on the kitchen floor surrounded by blood. A neighbor called the police.

*Crime Investigation*

The autopsy showed that Robinson had 10 stab wounds in her back. Multiple stab wounds penetrated her chest cavity and punctured her lung and liver. Robinson had significant amounts of blood in her chest cavity from her stab wounds. She also had defensive wounds on her hands and forearms and superficial cuts to her chest and torso. The shape of some of the wounds indicated that the likely cause was a single edged knife with a four inch blade. Police never found the murder weapon.

Police and forensic investigators searched Robinson's apartment for evidence. Robinson was lying on the floor in the kitchen. Her pants pockets seemed to be turned out and between her legs were a set of keys, a receipt, and a nickel. The telephone was about four feet away from her and the cord was cut or torn from the wall. In Robinson's bedroom, a dresser drawer was open.

Investigators collected blood evidence. There was blood on Robinson and around the kitchen, including a large blood smear on the refrigerator. There was a small smear of blood on the hallway wall across from the bathroom door. There were also blood spatters in front of a nightstand in Robinson's bedroom. The investigators took possession of the telephone from the kitchen and a jacket from the bedroom that appeared to have blood on it.

At the time, none of the evidence was tested for DNA because the science had not yet been developed to allow for DNA analysis of blood. Detectives were unable to identify a suspect or solve Robinson's murder.

In 2013, a detective reopened Robinson's case and arranged to have the blood evidence tested for DNA. Using a controlled sample of Robinson's blood from her autopsy, forensic scientists created Robinson's DNA profile. They then tested the blood samples taken from the bedroom, the jacket, the telephone cord, and Robinson's jeans. DNA from an unknown individual was present in the blood, and the DNA profile for that individual matched Mitchell's DNA profile. Mitchell was located in Florida, where he was arrested on charges of first degree premediated murder and brought to Washington for trial.

*Motion to Exclude Blood and DNA Evidence*

Mitchell filed a pretrial motion to exclude the DNA evidence based on an insufficient chain of custody. The trial court held a hearing on the issue, and several witnesses testified. The

court found that blood evidence was collected from the crime scene, stored in the sheriff's department forensics lab for 65 days, and then transferred to the sheriff's department property room. Robinson's clothing was originally collected by the medical examiner and then transferred to the sheriff's department property room four days later.

The trial court ruled that the State had established the chain of custody and therefore that the DNA evidence was admissible. The court ruled that any discrepancies in the chain of custody related to the weight of the evidence, not its admissibility. The court entered findings of fact and conclusions of law regarding its ruling.

*Trial*

Mitchell testified at trial that he knew Robinson and had been at her apartment a few times. The last time he was there some kids were asleep in the living room. He said that while he was with Robinson, she answered a knock at the door. An agitated man entered the apartment and tried to hit Robinson and Mitchell. Mitchell said that Robinson tried to get the man to leave and threatened to call the police, but the man stayed and exchanged blows with Mitchell.

According to Mitchell, the man left after Robinson again told him to leave. Then Mitchell followed Robinson to her bedroom and looked at himself in her dresser mirror. He later noticed that his hand was bleeding. Mitchell left the apartment and did not see Robinson again. He denied killing Robinson.

The jury found Mitchell guilty of first degree premeditated murder.

*Sentencing*

The State calculated Mitchell's offender score as 8, based on seven prior felony convictions. One of the prior felonies was a 1983 armed robbery committed in Florida. Mitchell

4

argued that the Florida robbery should be excluded from his offender score because it was not comparable to a Washington felony. The trial court ruled that the Florida robbery was comparable and found that Mitchell's offender score was 8. The trial court imposed a standard range sentence of 450 months.

Mitchell appeals his conviction and sentence.

## ANALYSIS

A. ADMISSIBILITY OF DNA EVIDENCE

Mitchell argues that the trial court should have excluded the DNA evidence because the State failed to sufficiently establish the chain of custody of the blood evidence collected at the crime scene. We disagree.

1. Legal Principles

Under ER 901(a), the proponent of evidence must authenticate or identify it "to support a finding that the matter in question is what its proponent claims." For physical evidence connected to the commission of a crime to be admissible, "it must be satisfactorily identified and shown to be in substantially the same condition as when the crime was committed." *State v. Campbell*, 103 Wn.2d 1, 21, 691 P.2d 929 (1984).

When an item of evidence is not readily identifiable and is susceptible to alteration by tampering or contamination, the proponent typically must show the chain of custody of the evidence from the time it was acquired. *State v. Roche*, 114 Wn. App. 424, 436, 59 P.3d 682 (2002). The proponent of the evidence must establish the chain of custody " '*with sufficient completeness* to render it *improbable* that the original item has either been exchanged with another or been contaminated or tampered with.' " *Id.* (quoting *United States v. Cardenas*, 864

F.2d 1528, 1531 (10th Cir. 1989)). The trial court should consider factors such as the nature of the item, the circumstances surrounding preservation and custody of the item, and the likelihood of tampering or alteration. *Roche*, 114 Wn. App. at 436.

But the proponent does not need to identify the evidence with "absolute certainty" or "eliminate every possibility of alteration or substitution." *Campbell*, 103 Wn.2d at 21. "[M]inor discrepancies or uncertainty on the part of the witness will affect only the weight of evidence, not its admissibility." *Id.*

The trial court has a "wide latitude of discretion" in determining the admissibility of evidence subject to a chain of custody challenge. *Id.* We review the trial court's decision for an abuse of discretion. *See id.*

2. Chain of Custody Facts

The trial court entered findings of fact in its ruling that the DNA evidence was admissible. Mitchell does not challenge the trial court's findings of fact, so they are verities on appeal. *State v. Chambers*, 197 Wn. App. 96, 124, 387 P.3d 1108 (2016), *review denied*, 188 Wn.2d 1010 (2017).

Forensic investigators Hilding Johnson and Ted Schlosser were responsible for collecting and processing the evidence from the crime scene. They did not have an independent recollection of the case, but testified at the hearing based on their reports and their standard practice in 1993.

The trial court's unchallenged findings of fact established that:

a. Johnson photographed and collected various items from Robinson's apartment that had blood on them.

b. Johnson took these items from the scene to the sheriff's office forensics lab, filling out a property report dated February 7, 1993 listing the items.

c. The forensics lab was a secure holding area where forensics officers could store evidence in locked lockers. However, there was no system to log evidence into or out of the forensics lab and no system to log where in the lab any item of evidence was at any given time.

d. Schlosser subsequently submitted the items Johnson collected to the sheriff's department property room. The property room was across the hall from the forensics lab.

e. The items Johnson collected were in the forensics lab from February 7 to April 13, a total of 65 days. During that time, the items were in law enforcement custody.

f. In 2014, the items Johnson collected were sent to the Washington State Patrol (WSP) Crime Laboratory for DNA analysis of the blood spots.

Johnson and Schlosser testified about the standard practices for handling evidence in 1993. Any items that potentially contained blood were placed in paper bags and stapled shut. Then the evidence would be transported to the secure forensics lab. Any wet or blood-soaked items would be placed into a drying room and the other items would be placed in a locked locker. After the evidence was logged and processed it would be taken to the property room where it would be logged again and securely stored. The court acknowledged that "[t]he methods of labeling and packaging evidence in 1993 were not of the caliber of labeling and packaging used today." Clerk's Papers at 193.

A second category of evidence went with Robinson's body from the scene to the medical examiner's office on February 7, 1993. There was no testimony regarding how this evidence

7

was stored in the medical examiner's office. On February 11, personnel from the property room

collected Robinson's clothing and vials of Robinson's blood from the medical examiner's office.

In 2014, these items also were sent to the WSP Crime Laboratory for DNA analysis.

3.   Analysis

The State was able to account for the blood evidence through each step in the chain of

custody. Johnson collected items that had blood on them from the scene and took them that

same day to the forensics lab. Schlosser submitted the items to the property room across the hall

65 days later. Regarding the other blood evidence, the medical examiner's office collected

Robinson's body and clothes from the crime scene and transferred custody of the clothes and

Robinson's blood to property room personnel four days later. The evidence from both sources

remained in the property room until transferred to the WSP Crime Laboratory for testing in 2014.

But Mitchell argues that the State failed to establish a sufficient chain of custody for this

evidence because it could not account for the handling of the items stored in the forensics lab for

65 days or the handling of Robinson's clothes while in the medical examiner's office for four

days.[1] Specifically, Mitchell claims that in the absence of evidence regarding storage procedures

in the forensics lab and the medical examiner's office, the State could not show that tampering or

contamination was improbable.

However, the trial court expressly found that the forensics lab was a secure holding area

that was locked to the general public. In addition, the court found that forensics officers could

store evidence in locked lockers. The chain of custody is not broken when evidence is stored in

---

[1] Mitchell does not challenge the handling of the evidence once it was placed in the property room.

8

a locked and secured area. *State v. Wilson*, 83 Wn. App. 546, 555, 922 P.2d 188 (1996). And there was no indication that tampering or contamination could occur in the medical examiner's office.

Robinson's clothes present a slightly different situation because there was no evidence as to how the clothes were handled or the security of the medical examiner's office. But the only evidence the State used from Robinson's clothes was a single spot of blood on her pants that provided a partial DNA profile matching Mitchells' profile. Mitchell does not explain how that blood spot could have been contaminated or tampered with in the medical examiner's office.

We agree with the trial court that the absence of evidence regarding how the blood evidence was handled in the forensics lab and the medical examiner's office amounted to minor discrepancies that do not affect the chain of custody. Therefore, Mitchell's argument relates to the weight rather than the admissibility of the blood evidence. *Campbell*, 103 Wn.2d at 21.

Mitchell also argues that chain of custody cannot be established because first responders, investigators, forensics lab staff and property room staff did not make any effort to prevent contamination of the blood evidence. He argues that there were no assurances that the evidence was properly preserved and uncontaminated.

But Mitchell's concerns about potential contamination are speculative. Evidence is admissible if the State's chain of custody shows that contamination was improbable. *Roche*, 114 Wn. App. at 436. Although Mitchell points out that there was a potential for contamination during collection and drying, that risk does not make it *probable* that the evidence was actually contaminated. And he did not provide any actual evidence that there was some probability of contamination. *See State v. Boehme*, 71 Wn.2d 621, 638, 430 P.2d 527 (1967) (holding

9

admission of blood and urine evidence was proper because "beyond mere speculation and innuendo, there is not the least indication in the evidence that the questioned exhibits were anything other than what they were represented to be or that they were contaminated in the course of their journey to the testing laboratory.").

Here, the State's failure to show that officers' used collection and storage procedures intended to prevent contamination of DNA evidence amounts to a minor discrepancy that does not affect the chain of custody. Therefore, Mitchell's argument relates to the weight rather than the admissibility of the blood evidence. *Campbell*, 103 Wn.2d at 21.

The State accounted for the evidence and provided an unbroken chain of custody. Mitchell's arguments about the risk of contamination are speculative and do not support a real probability that the evidence was not what the State claimed or that the evidence had been contaminated. Therefore, the risk of contamination is a matter affecting the weight of the evidence, not its admissibility. Mitchell was free to argue that the blood evidence had been contaminated and did in fact present expert testimony about the possibility of contamination based on the handling practices used in 1993.

As noted above, a trial court has wide discretion in determining the admissibility of evidence challenged on chain of custody grounds. *Campbell*, 103 Wn.2d at 21. We hold that the trial court here did not abuse its discretion in ruling that the State's chain of custody was sufficiently complete and in admitting the DNA evidence.

B.    SUFFICIENCY OF PREMEDITATION EVIDENCE

Mitchell argues that the State failed to present sufficient evidence to prove the element of premeditation, which is required for a first degree murder conviction. We disagree.

1.    Standard of Review

When evaluating the sufficiency of evidence for a conviction, the test is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the charged crime beyond a reasonable doubt. *State v. Homan*, 181 Wn.2d 102, 105, 330 P.3d 182 (2014). We will assume the truth of the State's evidence and all reasonable inferences drawn from that evidence when evaluating whether sufficient evidence exists. *Id.* at 106. We treat circumstantial evidence as equally reliable as direct evidence. *State v. Farnsworth*, 185 Wn.2d 768, 775, 374 P.3d 1152 (2016). And we also will defer to the trier of fact's resolution of conflicting testimony and evaluation of the persuasiveness of the evidence. *Homan*, 181 Wn.2d at 106.

2.    Legal Principles

To convict a defendant of first degree premeditated murder, the State must prove that the defendant acted with "premeditated intent to cause the death of another person." RCW 9A.32.030(1)(a). Premeditation is a separate and additional element from the intent requirement for first degree murder. *State v. Bingham*, 105 Wn.2d 820, 827, 719 P.2d 109 (1986). A defendant may act with intent to kill but without premeditation. *See State v. Ollens*, 107 Wn.2d 848, 851-52, 733 P.2d 984 (1987).

"Premeditation" is the " 'deliberate formation of and reflection upon the intent to take a human life [that] involves the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short.' " *State v. Gregory*, 158 Wn.2d 759, 817, 147 P.3d 1201 (2006) (quoting *State v. Hoffman*, 116 Wn.2d 51, 82-83, 804 P.2d 577 (1991)). The State may prove premeditation through circumstantial evidence if the inferences

drawn from the evidence are reasonable and the evidence is substantial. *Gregory*, 158 Wn.2d at 817.

But proof of premeditation requires more than the fact that the defendant had an *opportunity* to deliberate. *Bingham*, 105 Wn.2d at 826. "Otherwise, any form of killing which took more than a moment could result in a finding of premeditation, without some additional evidence showing reflection." *Id.* And RCW 9A.32.020(1) states that "the premeditation required in order to support a conviction of the crime of murder in the first degree must involve more than a moment in point of time."

Washington courts have recognized a number of factors that indicate premeditation, including: (1) infliction of multiple wounds, *Gregory,* 158 Wn.2d at 817; *State v. Cross*, 156 Wn.2d 580, 627, 132 P.3d 80 (2006); (2) attacking the victim from behind, *State v. Allen*, 159 Wn.2d 1, 8, 147 P.3d 581 (2006); *Hoffman*, 116 Wn.2d at 84; (3) the presence of defensive wounds on the victim and other evidence reflecting a struggle, *Gregory*, 158 Wn.2d at 817; *State v. Thompson*, 169 Wn. App. 436, 490-91, 290 P.3d 996 (2012); and (4) evidence of some other motive, such as robbery or sexual assault. *State v. Gentry*, 125 Wn.2d 570, 599, 888 P.2d 1105 (1995); *Ollens*, 107 Wn.2d at 853.

Although the above factors are all relevant to finding premeditation, courts have cautioned that "standing alone, multiple wounds and sustained violence cannot support an inference of deliberation and reflection." *State v. Ortiz*, 119 Wn.2d 294, 312, 831 P.2d 1060 (1992). But other evidence, combined with multiple wounds and sustained violence, does support an inference of premeditation. *State v. Sherrill*, 145 Wn. App. 473, 486, 186 P.3d 1157 (2008).

3.    Analysis

Here, several factors support premeditation.  Robinson suffered 10 stab wounds in her back.  The presence of multiple wounds and attacking the victim from behind are both factors supporting premeditation.  Robinson also had extensive defensive wounds on her hands, arms, and torso, indicating a prolonged struggle.  Robinson's pockets had been turned out and her dresser drawer had been opened, indicating that Mitchell's possible motive was robbery.

In addition, other evidence suggested that Mitchell planned the murder.  The phone had been pulled from the wall, which prevented Robinson from calling for help.  And none of the children in the next room were disturbed during the murder, indicating that Mitchell used some stealth or compelled Robinson's silence.

Viewing the evidence in the light most favorable to the State, any rational jury could have found premeditation beyond a reasonable doubt based on these factors.  This is not a case in which the State relied merely on the presence of multiple wounds.  Accordingly, we hold that the State presented sufficient evidence of premeditation to support Mitchell's first degree murder conviction.

C.    COMPARABILITY OF FLORIDA ROBBERY CONVICTION

Mitchell argues that his 1983 Florida conviction for armed robbery should not have been included in his offender score because the State failed to show that the Florida conviction was comparable to a Washington offense.  We disagree.

1.    Legal Principles

Out-of-state convictions can be included in a defendant's offender score only if they are either legally or factually comparable to a Washington conviction.  *State v. Arndt*, 179 Wn. App.

373, 378, 320 P.3d 104 (2014). Offenses are legally comparable if the elements of the out-of-state offense are the same or narrower than the Washington statute. *State v. Olsen*, 180 Wn.2d 468, 472-73, 325 P.3d 187 (2014). Offenses are factually comparable when defendant's actual conduct underlying the out-of-state offense would have violated the Washington statute. *State v. Thiefault*, 160 Wn.2d 409, 415, 158 P.3d 580 (2007). The sentencing court must compare the elements of the out-of-state offense to the elements of a Washington criminal statute that was in effect when the out-of-state crime was committed. *In re Pers. Restraint of Lavery*, 154 Wn.2d 249, 255, 111 P.3d 837 (2005).

2.   Legal Comparability

Mitchell was convicted of armed robbery under former Fla. Stat. § 812.13 (1975). That statute defined "robbery" as the "taking of money or other property which may be the subject of larceny from the person or custody of another by force, violence, assault, or putting in fear." Former FLA STAT. § 812.13(1). The crime was a first degree felony if the offender carried a firearm or other deadly weapon in the course of committing the robbery. Former FLA STAT. § 812.13(2)(a).

> The definition of robbery under Washington law in 1983 provided:
>
> A person commits robbery when he unlawfully takes personal property from the person of another or in his presence against his will by the use or threatened use of immediate force, violence, or fear of injury to that person or his property or the person or property of anyone. Such force or fear must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking; in either of which cases the degree of force is immaterial.

Former RCW 9A.56.190 (1975). And the Washington statute provided that the offense was first degree robbery if the offender was armed with a deadly weapon. Former RCW 9A.56.200 (1975).

14

Mitchell argues that the Florida statute was broader and not legally comparable to the Washington statutes for two reasons. First, he asserts that the Washington statute required taking from the person or in his presence, but the Florida statute required taking from the custody of a person. But taking property from a person's "presence" is substantially similar to taking property from a person's "custody." In Washington, if the property is taken from the presence of a person, that person must have an ownership, representative, or possessory interest in the property to support a robbery conviction. *State v. Richie*, 191 Wn. App. 916, 922-24, 365 P.3d 770 (2015). Similarly, in Florida custody means having care, supervision, or control over the property. *Gaiter v. State*, 824 So. 2d 956, 957 (Fla. Dist. Ct. App. 2002). The wording is not identical, but under both Florida and Washington law taking property that is under the care of another person by using force against that person is a robbery.

Second, Mitchell asserts that the Washington statute required force to be used to obtain or retain possession of the property or overcome resistance to the taking, while the Florida statute did not include that requirement. But Mitchell is incorrect that the force requirements were different under Florida and Washington law; both statutes required the taking of property through the use of actual or threatened force. Washington merely described "taking" in greater detail as the act of obtaining, retaining, or overcoming resistance to taking.

Although the statutes are not exactly the same, the law "does not require exactitude, only 'comparability.'" *State v. Jordan*, 180 Wn.2d 456, 466, 325 P.3d 181 (2014) (quoting *Lavery*, 154 Wn.2d at 255). The elements are "substantially similar," which is all that is required for legal comparability. *Thiefault*, 160 Wn.2d at 415. Accordingly, we hold that the trial court did

15

not err in including Mitchell's Florida conviction for armed robbery in his offender score because it was legally comparable to a conviction for robbery under Washington law.

3.    Factual Comparability

Mitchell's Florida conviction also was factually comparable to robbery in Washington. We may review the indictment or information from the out-of-state conviction to determine whether the defendant's conduct would have violated a comparable Washington statute. *Arndt*, 179 Wn. App. at 379.

The charging information under which Mitchell was convicted in Florida stated that Mitchell took the victim's room key and wallet from his person or custody, with the intent to permanently deprive him of the property, by using force or violence or by putting him in fear and while armed with a knife. This conduct met the Washington definition of robbery and would have constituted first degree robbery under former RCW 9A.56.200.

Accordingly, we hold that the trial court did not err in including Mitchell's Florida conviction for armed robbery in his offender score because it is factually comparable to a conviction for robbery under Washington law.

D.    APPELLATE COSTS

Mitchell asks that this court decline to impose costs if the State prevails because he is indigent. We decline to consider this issue. A commissioner of this court will consider whether to award appellate costs under RAP 14.2 if the State decides to file a cost bill and if Mitchell objects to that cost bill.

CONCLUSION

We affirm Mitchell's conviction of first degree premeditated murder and his sentence.

16

No. 48810-8-II

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

_____
MAXA, A.C.J.

We concur:

_____
JOHANSON, J.

_____
LEE, J.