MAR 28 2013



# IN THE COURT OF APPEALS STATE OF WASHINGTON
# DIVISION III

| | |
|---|---|
| STATE OF WASHINGTON, | ) |
| | ) No.    29980-5-III |
| Respondent, | ) |
| | ) |
| v. | ) |
| | ) ORDER GRANTING |
| CHRISTOPHER MARTIN OWENS, | ) MOTION FOR |
| | ) RECONSIDERATION |
| Appellant. | ) AND AMENDING OPINION |
| | ) |
| | ) |

THE COURT has considered appellants' motion for reconsideration, and is of the opinion the motion should be granted. Therefore,

IT IS ORDERED the motion for reconsideration of this court's decision of February 14, 2013, is granted.

IT IS ALSO ORDERED the court's opinion of February 14, 2013, is amended as follows:

On page 6, add the following new paragraph after the heading "A. Ocycontin Evidence":

In Mr. Owens' interview with Detective Darnell, Mr. Owens repeatedly told the detective about Mr. Tyler's oxycontin use. Mr. Owens believed that Mr. Tyler continued to use oxycontin because Ms. Brown had found some oxycontin pills in Mr. Tyler's things. He explained that he was afraid of Mr. Tyler because oxycontin made him more ill-tempered and Mr. Owens' oxycontin-addicted

cousin threatened to kill his grandparents. He also said that he believed that oxycontin "destroys the soul." Exhibit 66 at 6.

On page 6, delete the last two sentences of the second paragraph which state:

Mr. Owens argues, here on appeal, that he repeatedly told Detective Darnell about Mr. Tyler's oxycontin abuse. Br. of Appellant at 18. It may be in Exhibits 65 and 66, which is apparently a recording of the interview, but that exhibit is not part of the record on appeal and so we do not know.

On page 14, delete the entire first paragraph and insert the following paragraph in its place:

Mr. Owens relies on *Wanrow* to argue that the court here severely restricted what perceptions Mr. Owens was allowed to share with the jury. He argues that courts frequently allow a defendant's perception of the decedent's intoxication into evidence. And so the court should have allowed similar testimony about oxycontin. He also argues that any prejudice from this error is manifest because his first trial included evidence of oxycontin use and resulted in a hung jury. He continues that the evidence, if admitted, would have shown that he feared Mr. Tyler because Mr. Tyler became more ill-tempered when on oxycontin, Mr. Owens' oxycontin-addicted cousin threatened to kill his grandparents, and Mr. Owens believed that oxycontin makes the user soulless.

DATED:  March 28, 2013

FOR THE COURT:

_____
KEVIN M. KORSMO
Chief Judge

2

FILED

FEB 14, 2013

In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 29980-5-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| CHRISTOPHER MARTIN OWENS, | ) | |
| | ) | |
| Appellant. | ) | |

SWEENEY, J. — Christopher Owens shot and killed Richard Tyler with a gun that had two barrels, a .410 shotgun barrel and a .22 rifle barrel. He first used the shotgun barrel to shoot Mr. Tyler in the face and, after Mr. Tyler fell, he used the .22 barrel to shoot Mr. Tyler in the back of the head. Mr. Owens presented evidence and argued that he killed Mr. Tyler to defend himself and his mother from harm, and specifically, to defend his mother from a threatened sexual assault. He presented evidence that Mr. Tyler was a cruel bully who treated his mother badly and said things that Mr. Owens and his mother interpreted as an immediate threat to inflict injury, including sexual assault. A jury listened to four days of testimony, the court's instructions, and argument of counsel. It rejected Mr. Owens defense of self-defense and found him guilty of first degree

murder. We conclude that the jury was properly instructed, the court did not abuse its discretion in its various rulings on evidence, and there was no misconduct on the part of the State that would require reversal. We, therefore, affirm the conviction.

## FACTS

Richard Tyler and Christopher Owens' mother, Kellie Brown, had been in a romantic relationship since 2001. They began living together in Ms. Brown's home in late 2002. Mr. Tyler had always been a bully, but his behavior escalated in 2008—he pushed Ms. Brown down a flight of stairs. The couple broke up later that year.

In December 2008, they had an argument over the phone and Ms. Brown got a domestic violence protection order. Mr. Tyler had been out of town for months, but Ms. Brown knew that he would fly back on December 23. Ms. Brown delivered Mr. Tyler's dog to Mr. Tyler's relatives and made arrangements to transfer Mr. Tyler's property to them. Ms. Brown and Mr. Owens packed Mr. Tyler's possessions into his panel truck, which was at Ms. Brown's house. Ms. Brown talked to police about serving Mr. Tyler with the protection order when he arrived at the airport. She also asked Mr. Owens to be at her house on December 23 for protection.

No. 29980-5-III
State v. Owens

On December 23, 2008, Ms. Brown and Mr. Tyler spoke on the phone. Among other things, he said that he was coming to get "what's his." II Report of Proceedings[1] (RP) at 674. Ms. Brown told him that she had a protection order and that he was unwelcome at her house. Later, Mr. Tyler's father and sister picked up Mr. Tyler at the airport. They went to the Department of Licensing so Mr. Tyler could renew his license tabs, but he did not have his vehicle registration. So, they drove Mr. Tyler to Ms. Brown's house to get the vehicle registration.

Mr. Tyler entered Ms. Brown's garage through an overhead door. He then entered the house through a door between the garage and the basement. Ms. Brown dialed 911 and reported that Mr. Tyler was breaking into her house. As Mr. Tyler walked up the stairs leading to a landing in this split level house, Mr. Owens shot him in the face using the .410 shotgun barrel of a gun equipped with two barrels. After Mr. Tyler fell, Mr. Owens then shot him again in the back of the head, this time using the .22 rifle barrel. At some point, Ms. Brown yelled to Mr. Owens, "don't shoot him." II RP at 630. Police arrived shortly after and saw Mr. Tyler's dead body lying face down on the stairs connecting the basement and foyer. Mr. Owens admitted that he shot Mr. Tyler.

---

[1] I Report of Proceedings is the report of proceedings for the 2009 trial. II Report of Proceedings is the report of proceedings for the 2011 trial.

3

Detective Darin Darnell interviewed Mr. Owens later that day. Mr. Owens said that Mr. Tyler came to the house and began shaking the front door. He then heard noise from the garage door, which he believed his mother had jammed shut somehow. Mr. Owens walked halfway down the stairs between the main floor living room and the foyer. He warned Mr. Tyler not to come up the stairs and that he had a gun. Mr. Owens did not know whether Mr. Tyler heard the warning or saw the gun. Mr. Tyler did not respond and continued up the stairs between the basement and the foyer. Mr. Owens then shot him from his perch on the upper stairs. Mr. Owens had never seen Mr. Tyler hurt his mother. He told police he did not know whether Mr. Tyler would have assaulted Ms. Brown and that he did not know what Mr. Tyler would do. He felt threatened because Mr. Tyler had been told there was a restraining order but came into the house and did not stop. Mr. Owens also told the police that you do not pull a gun on someone unless you are going to use it.

The State charged Mr. Owens with first degree murder or, in the alternative, second degree murder. The case was tried in 2009 and Mr. Owens argued that he acted in self-defense. The 2009 trial resulted in a hung jury. The case was again tried in 2011 and Mr. Owens again presented evidence and argued that he acted to defend himself and his mother.

I. SELF-DEFENSE EVIDENCE

Mr. Owens testified that he saw changes in Mr. Tyler around 2008. Mr. Tyler became unpredictable and would "blow up." II RP at 665. Mr. Owens testified that he never saw Mr. Tyler assault Ms. Brown, but he did witness Mr. Tyler bully and intimidate her. He also believed that Mr. Tyler had pushed Ms. Brown down the front steps of her home. And he was generally fearful that Mr. Tyler might sexually assault Ms. Brown. When Mr. Tyler got into Ms. Brown's house on December 23, Mr. Owens was afraid for himself and his mother.

There were also statements in Mr. Owens' interview with Detective Darnell that tended to support Mr. Owens' theory of self-defense. Mr. Owens explained that he brought his gun to Ms. Brown's house because he did not want to get into a "physical fight" with Mr. Tyler. II RP at 418. He said that Mr. Tyler is "big" and is six inches taller than him. II RP at 418, 423. He repeatedly indicated that he did not want Mr. Tyler to beat up him or his mother.

Ms. Brown also testified on Mr. Owens' behalf. She testified generally that she feared Mr. Tyler, Mr. Tyler had threatened her in front of Mr. Owens, Mr. Tyler assaulted her in February 2008, and that he threatened to sexually assault her in December 2008.

5

*A. Oxycontin Evidence*

1. At First Trial

At the first trial, the State moved in limine to prevent any testimony about Mr. Tyler's use of oxycontin. The State argued that the evidence was irrelevant because there was no evidence to show that oxycontin tended to make Mr. Tyler, or any other user of oxycontin, violent.

Defense counsel argued that Mr. Tyler had been a bully throughout his relationship with Ms. Brown, but he began using oxycontin and it further "sour[ed] his disposition." I RP at 44. Counsel also said that Mr. Owens was afraid because Mr. Owens had a cousin who had threatened to kill his grandparents while on oxycontin. Mr. Owens also believed that Mr. Tyler continued to use oxycontin because Ms. Brown told Mr. Owens that she found some oxycontin pills in Mr. Tyler's things. Mr. Owens argues, here on appeal, that he repeatedly told Detective Darnell about Mr. Tyler's oxycontin abuse. Br. of Appellant at 18. It may be in Exhibits 65 and 66, which is apparently a recording of the interview, but that exhibit is not part of the record on appeal and so we do not know.

The court concluded that the evidence of oxycontin use was relevant, but "it's too speculative and too prejudicial at this time and not probative enough" and it granted the State's motion in limine. I RP at 168.

The State then played a recording of Detective Darnell's interview of Mr. Owens. The State spliced the recording to exclude Mr. Owens' statements about oxycontin. The recording indicated that Mr. Owens brought a gun to his mother's house because Mr. Tyler was big and Mr. Owens wanted to protect his mother.

After the State played the recording, defense counsel asked the court to reconsider its ruling excluding the oxycontin evidence. Counsel argued that the way the State spliced the recording was misleading. Rather than the recording indicating that Mr. Owens was afraid of Mr. Tyler because he was big and used oxycontin, which Mr. Owens asserts is what he told Detective Darnell, the spliced recording gave the impression that the only reason he feared Mr. Tyler was Mr. Tyler's size. I RP at 272. The court granted the motion for reconsideration and allowed evidence of the oxycontin use. I RP at 277.

2. At Second Trial

In the second trial, the court ruled that it would exclude evidence that Mr. Tyler used oxycontin. Mr. Owens again moved for reconsideration and argued that the

evidence was relevant to the reasonableness of Mr. Owens' actions. Specifically, counsel wanted the jury to know that:

- Mr. Owens' cousin threatened to kill his grandparents
- Mr. Owens' cousin was addicted to oxycontin
- Oxycontin use "was an issue" with Mr. Tyler
- Mr. Owens was aware that Ms. Brown and Mr. Tyler argued about Mr. Tyler's oxycontin use
- Mr. Owens noticed changes in Mr. Tyler similar to the changes that occurred in his cousin

II RP at 264-65. The court refused. It explained, "I don't really recall how or why it came into the last trial. The Court I think granted the motion in limine to prevent it from coming in and I think the Court would stick with that particular motion because I really haven't seen anything that makes it relevant." II RP at 265. Mr. Owens moved for reconsideration after the State again "opened the door," but the court denied the motion. II RP at 454.

*B. Boot Print Evidence*

The State moved in limine to prohibit Ms. Brown from testifying that some white scuff marks on the door between the garage and the basement was a boot print. The State argued that the marks were not there on December 23. 2008. Defense counsel responded that the evidence was admissible because it matched the boots Mr. Tyler was wearing when he was shot. He argued that the boots were in evidence and testimony would show

8

that witnesses outdoors at the time of the shooting heard three bangs, but Mr. Owens fired his gun only twice. And Ms. Brown had no knowledge that the door had been kicked before December 23, 2008. Counsel argued that Ms. Brown did not put the marks on the door, and she photographed and told law enforcement about the marks. Ms. Brown, however, could not testify as to the last time she saw the door prior to December 23, 2008.

The court concluded that the boot print evidence had not been properly preserved and refused to admit it. The court explained that nobody could testify about whether the print existed prior to the incident, photographs of the print were taken long after December 23, 2008, and the door was in Ms. Brown's possession the entire time.

Nonetheless, the bottom half of the door was admitted and Detective Dan Dieringer testified that the door was in its December 23, 2008, condition, except for the fact that there was a mark on the door that was not there on December 23, 2008. And Mr. Owens and Ms. Brown testified that they heard a very loud banging sound when Mr. Tyler entered the door between the garage and the basement. Two witnesses outdoors during the shooting also testified that they heard three loud bangs.

No. 29980-5-III
State v. Owens

II. JURY INSTRUCTIONS

During the voir dire process, the court instructed the prospective jurors that "[a] reasonable doubt is one for which a reason can be given." II RP at 8. But, when the court instructed the jury after all the evidence had been submitted, it instead instructed the jurors that a reasonable doubt is "one for which a reason exists."[2] Clerk's Papers (CP) at 59. The written instructions read by the court to the jury before their deliberations went with the jury into the jury room.

The court also instructed the jury on the elements of first degree murder and self-defense. By instruction 5, the court instructed that a person commits murder "when, with a premeditated intent to cause the death of another person, he or she causes the death of such person or of a third person, unless the killing is justifiable." CP at 60. Instruction 6 spelled out the elements the State had to prove for the jury to convict Mr. Owens of first degree murder. By instruction 12, the court instructed the jury that it had a duty to find Mr. Owens not guilty if the State failed to prove an absence of self-defense. CP at 67.

III. STATE'S CLOSING ARGUMENT

The prosecutor argued that Mr. Owens did not act in self-defense. He argued that Mr. Owens' actions were based on Mr. Tyler's bullying, but that shooting and killing Mr.

---

[2] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL (WPIC) 4.01 (3d ed. 2008).

10

Tyler was not an appropriate response. He argued that Mr. Tyler did not "have a hand in this" because, from Mr. Tyler's point of view, he was merely entering his own home. He pointed out that Mr. Tyler was not a stranger breaking into the house.

The prosecutor then related a personal anecdote. His dogs' barked and woke him and his wife. He sat up in bed and saw a figure standing in the hallway. The prosecutor grabbed a gun and charged at the figure. The figure turned out to be the prosecutor's son. The prosecutor explained that his son had an emergency at his house and did not call because he did not want to wake them. The prosecutor concluded the story by saying "my son had lived at that house. He didn't need to call. He didn't need to tell me." II RP at 783. From this, the prosecutor argued that Mr. Tyler was not a stranger to Ms. Brown. He argued that Mr. Tyler had not beaten up Ms. Brown. And he argued that while there were allegations of domestic violence, Mr. Tyler had merely gone into the house to retrieve some personal property.

The jury rejected Mr. Owens defense of self-defense and found him guilty of first degree murder.

DISCUSSION

I. RULINGS ON EVIDENCE

Mr. Owens assigns error to the court's decision to exclude evidence of Mr. Tyler's oxycontin use and the boot print on Ms. Brown's basement door. He argues that those evidentiary rulings impaired his ability to defend himself against these charges and specifically his ability to present evidence on, and argue, self-defense.

The right to compulsory process guarantees defendants the right to present a defense and their version of the facts. *Washington v. Texas*, 388 U.S. 14, 17-19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967). A defendant may claim self-defense when he committed the homicide to defend himself or a person in his company "when there is reasonable ground to apprehend a design on the part of the person slain to commit a felony or to do some great personal injury to the slayer or to any such person, and there is imminent danger of such design being accomplished." RCW 9A.16.050(1). Evidence of self-defense "must be assessed from the standpoint of the reasonably prudent person, knowing all the defendant knows and seeing all the defendant sees." *State v. Janes*, 121 Wn.2d 220, 238, 850 P.2d 495 (1993). And a jury is entitled to "'view the conduct of the [deceased] with all its pertinent sidelights as the appellant was warranted in viewing it.'" *Id.* (alteration in original) (quoting *State v. Wanrow*, 88 Wn.2d 221, 235-36, 559 P.2d 548

12

(1977)). The jury is entitled to consider the facts and circumstances known to the defendant, "even those substantially predating the killing." *Id.*

However, the right to present evidence, including evidence of self-defense, is not unlimited. *State v. Thomas*, 150 Wn.2d 821, 857, 83 P.3d 970 (2004). The standard of review we apply to a court's decision to exclude evidence is well established—it is the abuse of discretion standard of review. *State v. Pavlik*, 165 Wn. App. 645, 650-51, 268 P.3d 986 (2011) (reviewing whether the court abused its discretion by refusing to admit evidence of self-defense when the defendant argued that the evidentiary ruling violated his right to present a defense), *review denied*, 174 Wn.2d 1009 (2012). Ultimately, Mr. Owens contends that the court's evidentiary rulings amounted to a denial of his constitutional right to present a defense. Br. of Appellant at 28-32. He argues from this that our review is de novo. Reply Br. of Appellant at 8-12. Certainly, at some point, a court may so restrict a defendant's opportunity to present evidence to support a theory of the case that courts of review will step in and conclude that he was denied the right to a meaningful defense. *See State v. Jones*, 168 Wn.2d 713, 721, 230 P.3d 576 (2010). But that most certainly is not the case here. So instead we pass on whether the trial court had tenable grounds or reasons for its rulings. *Pavlik*, 165 Wn. App. at 651.

13

### A. Oxycontin Evidence

Mr. Owens argues that he told police he feared Mr. Tyler because, among other things, Mr. Tyler used oxycontin. He argues that he saw that oxycontin made his cousin threaten to kill his grandparents, and Mr. Owens believed that oxycontin made one soulless. He relies on *Wanrow* to argue that the court here severely restricted what perceptions Mr. Owens was allowed to share with the jury. He argues that courts frequently allow a defendant's perception of the decedent's intoxication into evidence. And so the court should have allowed similar testimony about oxycontin. He also argues that any prejudice from this error is manifest because his first trial included evidence of oxycontin use and resulted in a hung jury. He continues that the evidence, if admitted, would have shown that Mr. Owens knew that Mr. Tyler used oxycontin and that he became more ill-tempered when on oxycontin. It would have shown that Mr. Owens also feared Mr. Tyler because of the oxycontin use because he knew that his oxycontin-addicted cousin threatened to kill his grandparents.

Evidence is relevant if it has any tendency to make the existence of any material fact more or less probable. ER 401; *State v. Lord*, 161 Wn.2d 276, 294, 165 P.3d 1251 (2007). Evidence of Mr. Tyler's use of oxycontin may well have been relevant to Mr. Owens' subjective perception of Mr. Tyler. But that does not end our inquiry.

14

Even relevant evidence may be inadmissible if the judge concludes that the danger of unfair prejudice outweighs any probative value. ER 403; *State v. Rivers*, 129 Wn.2d 697, 710, 921 P.2d 495 (1996). Whether the danger of unfair prejudice outweighs the probative value depends on whether the evidence is likely to stimulate an emotional, rather than a rational, response. *State v. Powell*, 126 Wn.2d 244, 264, 893 P.2d 615 (1995). Whether the probative value of evidence outweighs its unfair prejudice, depends on the availability "of the other means of proof and other factors." *Id.*

Mr. Owens and Ms. Brown testified at some length that Mr. Tyler was aggressive, intimidating, a bully, and that Mr. Tyler pushed Ms. Brown down a flight of stairs and threatened to sexually assault her. Evidence of Mr. Tyler's oxycontin use might have offered some explanation of why Mr. Tyler was ill-tempered and violent. But Mr. Owens' fear was the important point and one that he was allowed to fully develop. The fact that Mr. Tyler's anger was fueled by oxycontin would have added little to this discussion. And there was no showing that Mr. Tyler actually used oxycontin on the day of the shooting or that Mr. Owens believed that Mr. Tyler had used the drug on the day of the shooting. Indeed, a toxicology report showed that Mr. Tyler hadn't used the drug. The oxycontin evidence then had little probative value.

15

And the court could have easily concluded that what little probative value the evidence had was substantially outweighed by the risk of prejudice. The court could have viewed evidence of Mr. Tyler's drug use as inherently prejudicial. *See State v. Stockton*, 91 Wn. App. 35, 41, 955 P.2d 805 (1998) (stating that evidence of drug use was "highly prejudicial"). The court was also correct to exclude evidence that Mr. Owens' oxycontin-addicted cousin threatened to kill his grandparents. That is the exact kind of emotionally charged evidence that ER 403 seeks to avoid. The evidence touches upon Mr. Owens' perception of Mr. Tyler, but it also would have invited the jury to conclude that Mr. Tyler was violent because people using oxycontin are violent.

The court correctly maintained its initial ruling from the first trial. II RP at 265. That ruling reflected the thoughtful balancing that cases require. I RP at 168.

*B. Evidence of the Boot Print*

Mr. Owens also argues that the court should have allowed evidence of a boot print on the basement door, again, to show that Mr. Owens' fear of Mr. Tyler was reasonable. Br. of Appellant at 36-42. He argues that the court's concerns over the chain of custody should have gone to the weight of this evidence rather than the admissibility.

A judge determines whether evidence is admissible; the jury determines what weight to attach to that evidence. ER 104(a), (e); *State v. Roche*, 114 Wn. App. 424, 436,

16

59 P.3d 682 (2002). To admit evidence, the evidence must be authenticated or identified "to support a finding that the matter in question is what its proponent claims." ER 901(a).

The evidence, here the door, must be in substantially the same condition as when the crime was committed. *State v. Campbell*, 103 Wn.2d 1, 21, 691 P.2d 929 (1984). The chain of custody should show that it is "'improbable that the original item has either been . . . contaminated or tampered with.'" *Roche*, 114 Wn. App. at 436 (emphasis omitted) (quoting *United States v. Cardenas*, 864 F.2d 1528, 1531 (10th Cir. 1989)). Factors the court may consider are the nature of the item, the circumstances of its preservation and custody, and the likelihood of contamination or tampering. *Campbell*, 103 Wn.2d at 21. The court here considered these factors.

Ms. Brown identified the boot print. But the circumstances of its preservation and the potential for contamination were significant. The boot print was on the door for at least eight months after the shooting. Ms. Brown had no knowledge whether or not the door had been kicked before December 23, 2008. She could not testify as to the last time she saw the door prior to December 23, 2008. The court excluded testimony about the boot print because nobody could testify about whether the print existed prior to the incident. It also excluded the testimony because photographs of the print were taken long

17

after December 23, 2008, and the door was in Ms. Brown's possession the entire time. These are tenable grounds. The court's refusal to admit evidence of the boot print was a discretionary decision and we conclude there was no abuse of discretion.

In another argument related to this door, Mr. Owens contends that prohibiting counsel from arguing that Mr. Tyler kicked the basement door down infringed on his right to counsel. Br. of Appellant at 1, 39-40. Closing argument is an important element of the Sixth Amendment right to counsel because it is the defendant's last chance to persuade the jury that there is a reasonable doubt. *Herring v. New York*, 422 U.S. 853, 862, 95 S. Ct. 2550, 45 L. Ed. 2d 593 (1975). Counsel has wide latitude to argue his theory of the case, but his argument "must be restricted to the facts in evidence and the applicable law." *State v. Perez-Cervantes*, 141 Wn.2d 468, 474, 6 P.3d 1160 (2000).

We cannot conclude, however, that the absence of the word "kick" from defense counsel's closing argument violated Mr. Owens' Sixth Amendment right to counsel. Mr. Owens does not cite to nor do we find any ruling prohibiting counsel from arguing that Mr. Tyler kicked down the door. Defense counsel did not specifically argue that Mr. Tyler "kicked" down the door, but he did argue that Mr. Tyler somehow breached a "70, 80, 90 pound[]" door and that the sound of the door slamming against the wall made a

18

loud banging noise. II RP at 833-34. Defense counsel was allowed to argue Mr. Owens' theory of the case.

## II. JURY INSTRUCTIONS

Mr. Owens next contends that the court's instructions to the jury were flawed. Specifically, the court (1) gave an incomplete instruction on self-defense—one that did not include a "commit-a-felony" alternative, (2) incorrectly defined reasonable doubt for the venire at the outset of the trial, (3) omitted self-defense as an element of first degree murder in the elements instruction, and (4) incorrectly instructed the jury that it had a duty to convict if the State proved its case beyond a reasonable doubt. We review the sufficiency of jury instructions de novo. *State v. Barnes*, 153 Wn.2d 378, 382, 103 P.3d 1219 (2005).

The issues raised by Mr. Owens here on appeal were not raised at trial. We generally refuse to review issues not preserved for appeal. RAP 2.5; *State v. O'Hara*, 167 Wn.2d 91, 97-98, 217 P.3d 756 (2009). We will, however, review manifest constitutional errors for the first time on appeal. RAP 2.5(a); *O'Hara*, 167 Wn.2d at 98. But this approach also becomes a problem here on appeal. Judge Marshall Forrest made an important observation that criminal law is so largely constitutionalized that any instructional error arguably implicates constitutional due process. *State v. Lynn*, 67 Wn.

App. 339, 342-43, 835 P.2d 251 (1992). Among other problems this presents is the temptation and the opportunity for competent counsel to not raise an issue in the trial court; an issue that may have little or no impact on a jury but may ultimately provide grist for the appellate mill. *Id.* And so Judge Forrest noted the important limitation imposed by RAP 2.5 is that the constitutional error be "manifest." *Id.* at 343. "'[M]anifest' means unmistakable, evident or indisputable, as distinct from obscure, hidden or concealed." *Id.* at 345. A manifest error must have "practical and identifiable consequences in the trial of the case." *Id.* With these introductory remarks, we turn to the specific objections Mr. Owens raises here on appeal.

*A. Self-Defense Instruction*

Mr. Owens argues that the court erred by not instructing that "[h]omicide is justifiable when committed in the lawful defense of the slayer, the slayer's parent, or any other person in the slayer's presence or company when . . . the slayer reasonably believed that the person slain intended *to commit a felony* or to inflict death or great personal injury." The instruction used here omitted "to commit a felony." CP at 67. Mr. Owens then urges that this violated his right to present a defense. He argues that this prevented the jury from considering whether Mr. Owens' reasonable belief that Mr. Tyler would sexually assault Ms. Brown justified the homicide. Br. of Appellant at 43-44. And he

20

argues that this is so because the jury might not consider a sexual assault a "great personal injury."

A self-defense instruction is not necessarily flawed because it omits the language "to commit a felony." *See State v. Brenner*, 53 Wn. App. 367, 376-77, 768 P.2d 509 (1989), *overruled on other grounds by State v. Wentz*, 149 Wn.2d 342, 350, 68 P.3d 282 (2003); WPIC 16.02 (bracketing "to commit a felony" and "to inflict death or great personal injury" and stating "[u]se bracketed material as applicable"). But even assuming that it was an error, it certainly was not manifest constitutional error. *See* RAP 2.5. The defense could have framed Mr. Tyler's intent as one to "commit a felony," but it chose not to. On appeal, Mr. Owens emphasizes Mr. Tyler's threat of sexually assaulting Ms. Brown. But Mr. Owens' theory at trial was that Mr. Owens shot Mr. Tyler because he feared "great personal injury" in the form of a beating. II RP at 691, 693-94, 816.

Moreover, the court defined "great personal injury" as "an injury that the slayer reasonably believed, in light of all the facts and circumstances known at the time, would produce severe pain and suffering if it were inflicted upon . . . another person." CP at 68. This definition allowed the jury to consider Mr. Owens' fear that his mother might be

21

sexually assaulted. Omitting "to commit a felony" from the self-defense instruction does not for us amount to manifest constitutional error by any standard.

*B. Reasonable Doubt Instruction*

Mr. Owens next argues that the court erred by instructing potential jurors that "[a] reasonable doubt is one for which a reason *can be given*" rather than "one for which a reason *exists*." II RP at 8 (emphasis added). The proper instruction is worded "one for which a reason exists." *State v. Bennett*, 161 Wn.2d 303, 317, 165 P.3d 1241 (2007). The Supreme Court explained that this definition is the best, but that other definitions are not necessarily unconstitutional. *Id.* at 316-18. In *State v. Castillo*, Division One of this court reversed a conviction because the trial court failed to follow *Bennett*'s directive. 150 Wn. App. 466, 473, 208 P.3d 1201 (2009).

The court's instruction here must be put into context. Mr. Owens did not object to the instruction. *See id.* at 467. More significantly, the court used the precise instruction directed by the state Supreme Court when it instructed the jury, charged with deciding the case, that reasonable doubt is "one for which a reason exists." CP at 59. The jury had the correct statement of the law during deliberations. *See Bennett*, 161 Wn.2d at 317. Even were we to assume the initial instruction to the potential jurors was flawed, we cannot conclude that incorrectly instructing the venire "had practical and identifiable

22

consequences." *Lynn*, 67 Wn. App. at 345. This was again not a manifest constitutional error.

### C. Elements Instruction

Mr. Owens next contends that the court's instruction to the jury on the elements of this crime is flawed because it fails to list an absence of self-defense as an element of first degree murder. Br. of Appellant at 57-62. He argues that the instruction then omits an essential element of the charge and leaves the jury with the impression that it may convict even if the State has not proved a lack of self-defense.

Omitting an element from an elements instruction is a manifest constitutional error because that instruction is the "yardstick" by which the jury measures guilt and innocence. *State v. Mills*, 154 Wn.2d 1, 6, 109 P.3d 415 (2005). We must then review the assignment of error despite Mr. Owens' failure to object in the trial court. *Id.* at 6.

The State has the burden to prove every element of the crime charged. *State v. Byrd*, 125 Wn.2d 707, 713-14, 887 P.2d 396 (1995). And the elements instruction must generally contain all of the elements required for a conviction. *Mills*, 154 Wn.2d at 7. The elements of first degree murder are (1) intent to cause the death of another and (2) actually causing the death. RCW 9A.32.030(1)(a). The court instructed the jury that

23

[t]o convict the defendant of the crime of Murder in the First Degree, each of the following elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about December 23, 2008, the defendant acted with intent to cause the death of Richard Lynn Tyler;

(2) That the intent to cause the death was premeditated;

(3) That Richard Lynn Tyler died as a result of the defendant's acts; and

(4) That any of these acts occurred in the State of Washington.

If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.

On the other hand, if, after weighing all of the evidence, you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

CP at 61. The court's instruction on the necessary elements was virtually identical to WPIC 26.04.

The State must prove, of course, the lack of self-defense beyond a reasonable doubt when a defendant makes out a prima facie case of self-defense. *State v. Walden*, 131 Wn.2d 469, 473-74, 932 P.2d 1237 (1997). Mr. Owens argues that, because he properly raised self-defense, and presented evidence of self-defense, a lack of self-defense should have been listed among the elements of first degree murder. But the Supreme Court has already rejected this argument. *State v. Hoffman*, 116 Wn.2d 51, 804 P.2d 577 (1991). In *Hoffman*, the court concluded that an instruction that did not list an

24

absence of self-defense as an element does not relieve the State of its burden or prevent the defendant from arguing its case. *Id.* at 109.

Mr. Owens invites us to revisit *Hoffman* because the law has changed since *Hoffman* was decided. Reply Br. of Appellant at 16-21. Mr. Owens cites to *State v. Mills*,[3] *State v. Valentine*,[4] and *State v. Janes*.[5] But none of these cases touch upon the precise issue in *Hoffman*. *Hoffman* is still good law. And *Hoffman* would dictate that the elements instruction here was adequate.

Additionally, a lack of self-defense is also already part of first degree murder's elements. Generally, there are two ways that an absence of self-defense may be an element of the charged crime: (1) the statute reflects legislative intent to treat an absence of self-defense as an element, or (2) proof of self-defense negates an element of the crime. *State v. Acosta*, 101 Wn.2d 612, 615, 683 P.2d 1069 (1984), *abrogated on other*

---

[3] *Mills*, 154 Wn.2d at 6-15 (holding that the "to convict" instruction on felony harassment was inadequate when the "threat to kill" element was listed in a special verdict instruction instead of the "to convict" instruction).

[4] *State v. Valentine*, 132 Wn.2d 1, 935 P.2d 1294 (1997) (holding that a person cannot assert self-defense in an arrest where that person is faced only with a loss of freedom and is not resisting an attempt to inflict injury).

[5] *Janes*, 121 Wn.2d at 242 (concluding that certain evidence was not "too far removed" from the crime and court should have considered it from the defendant's point of view before denying his motion for a self-defense instruction).

*grounds by State v. Camara,* 113 Wn.2d 631, 781 P.2d 483 (1989). Self-defense has

been described as "'another element of the offense which the State must prove beyond a

reasonable doubt.'" *State v. Jordan,* 158 Wn. App. 297, 301, 241 P.3d 464 (2010)

(quoting *State v. McCullum,* 98 Wn.2d 484, 493-94, 656 P.2d 1064 (1983)). But that

notion follows from an earlier version of the criminal code; one that characterized

homicide as murder "unless it was 'excusable or justifiable.'" *Jordan,* 158 Wn. App. at

301; *see* LAWS OF 1909, ch. 249, §§ 140, 141, 143.

Under the revised code, self-defense negates the intent elements of the crime

charged. *McCullum,* 98 Wn.2d at 495; *see Acosta,* 101 Wn.2d at 616; *Jordan,* 158 Wn.

App. at 301. The mens rea element for first degree murder is intent. *See* RCW

9A.32.030(1)(a). Intent is acting "with the objective or purpose to accomplish a result

which constitutes a *crime*." RCW 9A.08.010(1)(a) (emphasis added). Self-defense is

"[i]n the *lawful* defense of the slayer, or his . . . parent . . ., when there is reasonable

ground to apprehend a design on the part of the person slain to commit a felony or to do

some great personal injury to the slayer or to any such person, and there is imminent

danger of such design being accomplished." RCW 9A.16.050(1) (emphasis added).

Self-defense negates first degree murder's intent element because

> [a] person acting in self-defense cannot be acting intentionally as that term
> is defined in RCW 9A.08.010(1)(a). There can be no intent to kill within

26

the first degree murder statute unless a defendant kills "unlawfully," *i.e.,* "with the objective or purpose to accomplish a result which constitutes a crime." . . . Since self-defense is explicitly made a "lawful" act under Washington law, . . . it negates the element of "unlawfulness" contained within Washington's statutory definition of criminal intent.

*McCullum,* 98 Wn.2d at 495 (citations omitted). The absence of self-defense is then part and parcel of this intent element. So there was no need to also list it as an additional element because self-defense negates the mens rea element of the crime charged. *Id.*; *see Acosta,* 101 Wn.2d at 616; *Jordan,* 158 Wn. App. at 301.

The State was required to prove premeditation for the jury to find Mr. Owens guilty of first degree murder. And, certainly, if the State convinces the jury that the killing here was premeditated murder, it has proved the absence of self-defense. *Compare* RCW 9A.32.030(1)(a) (listing "premeditated intent" as an element of first degree murder) *and* RCW 9A.16.050.

The instruction here neither omitted an element nor misled the jury. Self-defense negates murder's intent element, a lack of self-defense was then embedded into the intent element. The jury could not have found that intent *and* self-defense. The statement "[i]f you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty," was not misleading.

27

The instruction here neither omitted an element nor misled the jury.

*D. Duty to Return a Verdict of Guilty*

Mr. Owens also assigns error to the court's direction in the elements instructions that "[i]f you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty." CP at 61. The language of this instruction is from WPIC 26.04. Mr. Owens argues that, under Washington law, juries never have a duty to return a verdict of guilty and that the instruction violates article I, sections 21 and 22 of the Washington State Constitution. The rationale that underlies Mr. Owens' challenge has been rejected in two recent cases. *State v. Meggyesy*, 90 Wn. App. 693, 958 P.2d 319 (1998), *abrogated on other grounds by State v. Recuenco*, 154 Wn.2d 156, 110 P.3d 188 (2005); *State v. Bonisisio*, 92 Wn. App. 783, 794, 964 P.2d 1222 (1998). We agree with their reasoning.

III. PROSECUTORIAL MISCONDUCT

Mr. Owens next contends that the State's closing argument amounted to prosecutorial misconduct. The alleged misconduct occurred when the prosecutor told a personal story:

> My wife and I were sleeping . . . . We have a couple dogs. . . . All of a sudden we heard them bark. . . . [A]s we were laying there, they started that kind of yipping and then it became more heated, the barking and the yapping. And, you know, I was still half asleep, my wife is still half asleep,

28

but that woke me up enough that . . . I sat up and in our bedroom, the hallway as you look down, I could see a figure standing there. Okay? Scared the hell out of my wife.

And just outside of our bedroom there's a hallway, there's a landing, and down that landing, well actually we have the same landing. Down the landing, the first flight, it goes down to . . . down the stairs. . . . And this person was standing there and he actually was faced down the landing. Okay? Had a hood on. Couldn't see his face. . . . Was wearing a jacket. I bolted up. Now, I have a firearm as well. . . . I responded and I aggressively went in the direction of the guy. And for that split second I didn't know who he was. But just a moment later, I realized who it was. It was my son. He had an emergency at his house. He didn't want to wake us, but he walked in without telling us he was coming over.

II RP at 782-83. The prosecutor then went on to argue that Mr. Tyler was not a stranger to Ms. Brown. He argued that Mr. Tyler had not beaten Ms. Brown. And he argued that, although there were allegations of domestic violence, Mr. Tyler had merely gone into the house to retrieve some personal property.

Mr. Owens did not object to these comments at trial, where the judge could have addressed his complaints and done something about it, if warranted. Because his objection was lodged for the first time here on appeal, he has an increased burden. *State v. Emery,* 174 Wn.2d 741, 761-62, 278 P.3d 653 (2012). He must show that "(1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury

29

verdict.'" *Id.* at 761 (quoting *State v. Thorgerson*, 172 Wn.2d 438, 455, 258 P.3d 43 (2011)). We do not think he has shown either.

Appeals to passion and prejudice are improper. *State v. Gregory*, 158 Wn.2d 759, 810, 147 P.3d 1201 (2006). So is urging a jury to decide based on facts outside the record. *State v. Pierce*, 169 Wn. App. 533, 553, 280 P.3d 1158, *review denied*, 175 Wn.2d 1025 (2012). But every improper comment is not necessarily prejudicial. *See State v. Elmore*, 139 Wn.2d 250, 292, 985 P.2d 289 (1999). Certain comments, of course, are more likely to be prejudicial. *Emery*, 174 Wn.2d at 763 (citing *State v. Belgarde*, 110 Wn.2d 504, 506-07, 755 P.2d 174 (1988) (calling a Native American group that the defendant was affiliated with was "'a deadly group of madmen'" and "'butchers'" and told the jury to remember Wounded Knee); *State v. Reed*, 102 Wn.2d 140, 143-44, 684 P.2d 699 (1984) (calling the defendant a "liar" and discounting defense witnesses' credibility because they are from out of town and drive expensive cars)); *see also Pierce*, 169 Wn. App. at 556 (focusing on the shocking nature of the crimes and asking the jurors to imagine themselves being murdered in their homes); *State v. Claflin*, 38 Wn. App. 847, 851, 690 P.2d 1186 (1984) (reading emotional poem about what it feels like to be raped). Other comments "simply do not rise to such level." *Elmore*, 139 Wn.2d at 292.

30

We review a prosecutor's statements in the context of the entire argument, the issues of the case, the evidence addressed in the argument, and the jury instructions. *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997). When so viewed, we are unable to conclude that the prosecutor's statements here rise to the level of those in *Belgarde*, *Reed*, *Pierce*, and *Claflin*. Those statements had no purpose other than to appeal to the jury's passion. The comments here certainly involved facts outside the record, but they are not the type calculated to stir the jury to convict based on passion rather than the law and evidence. The argument here addressed Mr. Owens defense, self-defense, by suggesting that shooting an unarmed man who previously cohabited with the owner of the house was probably ill considered and an unreasonable reaction to events. The point of the story, a point supported by the State's evidence, was that Mr. Tyler was not a stranger to this house. He had lived there and, so far as he knew, his stuff was still in the house.

Clearly, the story was not part of the evidence and the prosecutor never suggested that it was. The court also gave the standard cautionary instruction that "[t]he lawyers' remarks, statements, and arguments are intended to help you understand the evidence and apply the law. It is important, however, for you to remember that the lawyers' statements are not evidence. The evidence is the testimony and the exhibits." CP at 55. The

31

prosecutor's argument appears to be the kind of analogies or comparisons that lawyers frequently use in arguments to the jury. The jury was free to reject that comparison as farfetched, a poor example, or ultimately not helpful.

But, even if we were to agree with Mr. Owens that the comments were an improper appeal to the emotions, he must still show that they were "so flagrant and ill intentioned that no curative instruction would have obviated the prejudice it engendered." *State v. Munguia*, 107 Wn. App. 328, 336, 26 P.3d 1017 (2001) (citing *Hoffman*, 116 Wn.2d at 93). We are not convinced that a timely objection and a curative instruction would not have adequately addressed Mr. Owens' concerns.

We affirm the conviction.

A majority of the panel has determined that this opinion will not be printed in the Washington Appellate Reports but it will be filed for public record pursuant to RCW 2.06.040.

Sweeney, J.

WE CONCUR:

Korsmo, C.J.

Kulik, J.

32